LEXIS–NEXIS, a division of Reed Elsevier Inc., Plaintiff,

v.

David BEER, Defendant.

No. Civ. 98–2517 (DSD/JMM).

United States District Court, D. Minnesota.

March 22, 1999.

Janie S. Mayeron, Nicole A. Engisch, Daniel Oberdorfer, and Leonard, Street and Deinard, Minneapolis, MN, for plaintiff.

Randall E. Kahnke, John E. Connelly, and Faegre & Benson, Minneapolis, MN, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's (1) motion for sanctions and (2) motion for preliminary injunction. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court (1) grants in part and continues in part plaintiff's motion for sanctions and (2)

grants in part and denies in part plaintiff's motion for preliminary injunction.

## BACKGROUND

In September 1995, David Beer began working as an account manager for Lexis–Nexis, one of the largest electronic data services companies in the world. Before joining Lexis–Nexis, Beer worked as a salesperson for Scantron, selling software to companies in Minnesota and Wisconsin. As a condition of his employment, Lexis–Nexis required Beer to sign its standard noncompete/nondisclosure agreement. By this agreement, Beer promised that (1) during and for one year after his employment, he would not engage in any competitive activity, without Lexis–Nexis's written consent and (2) during and at any time after his employment, he would not disclose or misappropriate confidential Lexis–Nexis information.

During his three years at Lexis–Nexis, Beer sold Lexis–Nexis products and services to Minnesota customers. He worked largely from a home office, sometimes traveling to Lexis–Nexis's branch or national offices to receive sales training. Communicating via mail and e-mail, Lexis–Nexis frequently sent Beer what it considered sensitive company documents, including detailed performance reports, sales strategies and policies, and product development reports. Lexis–Nexis also provided Beer with home office equipment, including a laptop computer. Onto this laptop, Beer loaded a database program called ACT that he had brought with him from his previous job at Scantron. Beer used the ACT database to record customer information and track customer contacts.

Dissatisfied with his compensation, Beer began interviewing with other companies in the summer of 1998. In August 1998, he was contacted by a recruiter working with Dow Jones Interactive Publishing, a direct competitor of Lexis–Nexis. By the end of the month, Beer had received an offer of employment from Dow Jones. On September 14, 1998, Beer notified his supervisor, Barbara Gabric, that he was resigning from the company and that he intended to go into the landscaping business for himself. In the following days, Beer repeatedly told Lexis–Nexis employees of his landscaping plans. On September 25, 1998, after Lexis–Nexis refused several requests by Beer for a salary increase, Beer officially ended his employment with Lexis–Nexis. A week later, on October 1, 1998, Beer began working for Dow Jones. Beer's job at Dow Jones was to involve substantially the same duties as those he performed at Lexis–Nexis: selling information services and products to corporate customers and prospective customers located in Minnesota.

Before he began working at Dow Jones, Beer copied the Lexis–Nexis ACT database onto a high-capacity Iomega Zip disk. Beer claims that he acted under the assumption that the ACT database, which he had brought with him from his previous job, was his personal property. Beer also copied hundreds of Lexis–Nexis e-mails, many with arguably sensitive company documents. Beer now claims that, at the time, he meant to copy only a few e-mails containing personal subject matter. At about the same time, Beer went through his ACT database on the Lexis–Nexis laptop to clean out outdated information. Lexis–Nexis alleges that rather than deleting useless data, Beer deleted important customer information. On September 30, 1998, Beer returned the Lexis–Nexis laptop to Joe Krammer, the other Lexis–Nexis sales representative for the Minnesota territory. Thereafter, Beer took the ACT database and e-mails on the Zip disk and transferred them to a new laptop he had received from Dow Jones. He then threw the Zip disk away.

Lexis–Nexis alleges that on October 23, 1998 it first became certain of Beer's employment at Dow Jones. On November 18, 1998, Lexis–Nexis wrote to Beer and demanded that he immediately stop working with Dow Jones and that he return all

Lexis–Nexis documents to the company. When Beer did not respond, Lexis–Nexis brought this diversity suit in federal court, claiming breach of restrictive covenant, breach of loyalty, misappropriation of trade secrets, theft, conversion, tortious interference, and unfair competition. On November 25, 1998, Lexis–Nexis personally served Beer with a summons and complaint, a motion for a temporary restraining order ("TRO"), a motion for expedited discovery, and a first set of requests for production of documents. The discovery requests included requests for all documents he might possess that related to his employment at Lexis–Nexis, including those stored on computers. In Beer's response to these requests, he confirmed that all non-privileged responsive documents would be produced.

On November 30, 1998, this court held a hearing on Lexis–Nexis's motion for TRO. At the hearing, the court stated: "I want[ ] to make sure you [know] not to make another copy or, somehow or another, try to avoid what is the obvious intent of this order—which is that everything that Mister Beer has that he developed, got, and so forth—while he was at Lexis–Nexis—be given back to Lexis–Nexis . . . so that there's nothing in physical form." Transcript of TRO Hearing at 87 (Nov. 30, 1999). The court specifically instructed that "another copy ought not to be made before it is turned over. In other words, Mister Beer ought not to have any of that material with him, . . . and that is what I am so ordering here this afternoon." TRO Hearing at 84–85. In response, Beer's TRO attorney, who has since been replaced as counsel, assured the court that he would produce all Lexis–Nexis documents Beer had within 24 hours. The following day, the court issued a written order, repeating that "Beer shall deliver to Lexis–Nexis the copy of the ACT! database that he made and shall retain no copy." Nov. 30, 1998 TRO at 3. At no time

during the hearing, or immediately after, did Beer's counsel inform the court that Beer's copy of the ACT database and other Lexis–Nexis information was located on a laptop owned by Dow Jones.[1]

After the hearing, rather than handing over his current copy of the Lexis–Nexis information as ordered by the court, Beer attempted to reconstruct the Lexis–Nexis ACT database on the Dow Jones laptop to which he had copied the original. He copied the reconstructed version onto another Zip disk, along with 37 Lexis–Nexis e-mails, and handed the disk over to his TRO counsel, who, in turn, delivered it to Lexis–Nexis's counsel. Beer then deleted the entire ACT database from his hard drive.

After the TRO hearing, the parties engaged in expedited discovery. In December 1998, Beer's new counsel informed Lexis–Nexis's counsel that the TRO disk Lexis–Nexis had received was a reconstructed version of the Lexis–Nexis ACT database and that Beer had deleted an earlier version of the database from his Dow Jones computer. Lexis–Nexis's counsel asked Beer's counsel to take immediate possession of Beer's Dow Jones laptop. After obtaining the laptop, Beer's counsel attempted to make an image copy of the laptop's hard drive. Beer's counsel now concedes that, during this process, they inadvertently overwrote the remnants of some previously deleted data.

Finally, late in January, the Dow Jones laptop was produced to Lexis–Nexis and analyzed by its forensic computer expert. Proceeding on the premise that Beer had deleted all Lexis–Nexis information from the computer, as Beer had represented, Lexis–Nexis's expert analyzed the deleted files on the Dow Jones laptop's hard drive. Lexis–Nexis's expert determined that Beer had deleted a number of important Lexis–Nexis documents that he had not

---

1. What is more, it appears that on the day of the hearing, the laptop was in the hands of a Dow Jones computer technician in Chicago. It is unclear how the laptop was subsequently returned to Beer.

earlier acknowledged possessing, including detailed customer reports called Ultimate Reports. Based on the expert's finding that Beer had destroyed important evidence and violated the court's TRO, Lexis–Nexis brought this motion for sanctions in conjunction with its previously scheduled motion for preliminary injunction.

After the filing of Lexis–Nexis's motion papers, however, more information came to light. Experts for both parties discovered that the apparently deleted Lexis–Nexis documents were, in fact, still present in active files on the Dow Jones laptop. Further, the experts found hundreds of Lexis–Nexis e-mails, many with sensitive company documents attached, none of which Beer had previously acknowledged possessing. Beer claims that the transfer of these Lexis–Nexis documents to his Dow Jones was completely inadvertent and that he had no knowledge of these documents at any prior time. The parties sharply disagree as to whether the forensic evidence supports Beer's contention.

## I. Motion for Sanctions

In its motion for sanctions, Lexis–Nexis alleges that Beer (1) destroyed evidence critical to its noncompete and trade secret claims and (2) violated several pretrial orders, including the court's November 30, 1998 TRO. To remedy these alleged abuses, Lexis–Nexis asks the court to (1) draw from the destroyed material evidentiary inferences adverse to Beer when ruling on the concurrent preliminary injunction motion and (2) award Lexis–Nexis the costs and attorneys fees that Beer's alleged misconduct caused.

■ When a party violates a discovery order, Federal Rule of Civil Procedure 37(b)(2) provides that "the court in which the action is pending may make such orders in regard to the failure as are just." The court's menu of sanctions include: (1) "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action" and

(2) an order requiring "the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, cause by the failure ." Further, the court may invoke its inherent power to sanction parties for abusive practices even when a party's actions lie outside the formal boundaries of Rule 37. *See Capellupo v. FMC Corp.*, 126 F.R.D. 545, 551 (D.Minn. 1989) (holding that sanctions are appropriate for pre-litigation abuses, but using Rule 37 as a model for appropriate penalties).

■ The Eighth Circuit has stated that " '[s]anctions may be imposed against a litigant who is on notice that documents and information in his possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information.' " *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266 (8th Cir.1993) (quoting *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984)). As parsed by a leading commentator on the subject, "sanctions are appropriate when a party (1) destroys (2) discoverable material (3) which the party knew or should have known (4) was relevant to pending, imminent, or reasonably foreseeable litigation." Jamie S. Gorelick et al., *Destruction of Evidence* § 3.8, at 88 (1989).

Here, Lexis–Nexis has established the last three elements of his destruction of evidence claim: from the moment he decided to go to work for Dow Jones, a direct competitor of Lexis–Nexis, Beer either knew or should have known that the Lexis–Nexis material he possessed was relevant to reasonably foreseeable litigation. However, the court is not convinced that Lexis–Nexis can show the first and most important element: that relevant evidence was actually destroyed. First, as the most recent expert reports from both parties establish, the documents that Lexis–Nexis

initially believed Beer had deleted are, in fact, still present in undeleted form on the laptop's hard drive. Second, while Beer concedes that he discarded the Zip disk that he used in transferring his ACT database and Lexis–Nexis e-mails to the Dow Jones computer, the vast majority of the information on that disk, if not all of it, has been preserved on Beer's TRO disk and the Dow Jones laptop computer. Third, while Beer's counsel concedes that it inadvertently overwrote some inactive data when making an image copy of the hard drive on the Dow Jones laptop, Lexis–Nexis has not demonstrated that any of this lost data would have contained evidence pertinent to the present litigation. *See Gates Rubber Co. v. Bando Chemical Indus.*, 167 F.R.D. 90, 104 (D.Colo.1996). ("[The moving party] must establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the [destroyed material] would have produced evidence favorable to his cause.").

Moreover, even if the court were to find that some relevant information had been overwritten, Lexis–Nexis has not demonstrated that this loss of evidence would prejudice its case. *See Dillon*, 986 F.2d at 263. ("[B]efore a sanction for destruction of evidence is appropriate ... there must also be a finding that the destruction prejudiced the opposing party."); Gorelick et al., § 3.16, at 117 (stating that the court must fashion "the least onerous sanction corresponding to ... the prejudice suffered"). There is little reason to believe that any lost computer information would be substantially different in character from that of the preserved information. From the outset, the focus of Lexis–Nexis's trade secret argument has been that Beer improperly retained customer contact information and company documents such as the Ultimate Reports. In conducting its forensic analysis of Beer's TRO disk and his Dow Jones laptop, Lexis–Nexis has discovered exactly this kind of information. The court is not willing to presume that the overwritten computer data on the Dow

Jones laptop contained information any more sensitive, or evidence any more damning, than what Lexis–Nexis expected to find in the first place. Accordingly, the court will not draw any adverse evidentiary inferences when evaluating Lexis–Nexis's preliminary injunction below.

That being said, the court nonetheless concludes that Beer's conduct warrants monetary sanctions. On November 30, 1998, this court ordered Beer to (1) turn over to Lexis–Nexis's counsel all the Lexis–Nexis information he possessed, regardless of form, and (2) refrain from making an additional copy of this information. Beer complied with neither aspect of the order. Rather than turning over the Lexis–Nexis information as it existed at the time of the hearing, Beer fashioned a new copy of the Lexis–Nexis ACT database and then deleted the version on the Dow Jones computer. Further, Beer failed to immediately turn over hundreds of Lexis–Nexis e-mails, some of them with potentially sensitive company documents attached. He retained possession of this material until at least a month after the TRO hearing, a clear violation of the court's order.

In response to these undisputed facts, Beer states that (1) after the TRO, he produced the reconstructed disk and deleted information from his Dow Jones laptop only at the instruction of his TRO counsel and (2) he is as surprised as anyone by the presence on the Dow Jones laptop of hundreds of previously undisclosed e-mails and company documents. With regard to the first point, the court notes that Beer was personally present at the TRO hearing. He was fully capable of following the court's instructions and correcting any wrong impression his attorney might have left with the court and Lexis–Nexis's counsel about the actual status of the Lexis–Nexis information in his possession. With regard to the second point, the court is far from convinced that someone as experienced with computer software as Beer

might (1) inadvertently transfer hundreds of e-mails from his Lexis–Nexis laptop to his Dow Jones laptop and (2) fail to later notice this mistake when selecting 37 of these e-mails to transfer from his Dow Jones laptop to the TRO disk.

Regardless, Beer's actions—and his delay in revealing them to the opposing party—set off a high-tech wild goose chase that has needlessly multiplied the time and expense of this litigation. Accordingly, the court concludes that monetary sanctions are appropriate. For the time being, however, the court will reserve judgment as to the size of the sanction. Because this litigation is still at an early stage, the court will wait for a more complete factual picture to emerge before assessing fees and costs. The court asks Lexis–Nexis to renew its motion at an appropriate time later in the litigation.

## II. Preliminary Injunction Motion

■■■ Lexis–Nexis also brings a motion for preliminary injunction, asking the court to enter an order terminating Beer's employment with Dow Jones. In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. CL Systems, Inc.:* (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. 640 F.2d 109, 112–114 (8th Cir.1981). The court balances the four factors to determine whether injunctive relief is warranted. *See id.* at 113; *West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) The plaintiff bears the burden of proof concerning each of them. *See Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

### A. Likelihood of Success on the Merits

In their motion papers, the parties have focused on two of Lexis–Nexis's claims against Beer: his alleged breach of the noncompete agreement and his alleged misappropriation of trade secrets. The court will address each claim in turn.

### 1. Noncompete Claim

■■■ The parties agree that Ohio law should govern the court's assessment of Lexis–Nexis's noncompete claim. Ohio courts will enforce reasonable noncompete agreements only. *See Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975). Thus, in order to prevail on a noncompete claim, an employer must show that the restraint imposed by the agreement is (1) no greater than necessary for the protection of the employer's legitimate business interests, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *See id.* The employer must prove the reasonableness of the agreement by clear and convincing evidence. *See Ohio Urology, Inc. v. Poll,* 72 Ohio App.3d 446, 594 N.E.2d 1027, 1032 (1991); *American Eagle Ins. Co. v. Thompson,* 85 F.3d 327 (8th Cir.1996) ("The burden of proof in a diversity action is typically a matter of state law.") Considerations relevant to the reasonableness inquiry include: (1) the agreement's geographic and temporal limits; (2) whether the employee represents the sole customer contact; (3) whether the employee possesses confidential information or trade secrets; (4) whether the agreement seeks to restrain ordinary, rather than unfair, competition; (5) whether the agreement stifles inherent skills of the employee or whether employee's talents were developed during the employment; (6) the balance of the agreement's detriment to employer and employee; (7) whether the agreement restricts employee's sole means of support; (8) whether the restricted employment is merely incidental to the main employment. *See Raimonde,* 325 N.E.2d at 547.

The Lexis–Nexis noncompete agreement signed by Beer [2] prevents him from engaging in "competitive activity" for one year after leaving the company. "Competitive activity" is defined as follows:

As used herein, the term "competitive activity" shall include acting directly or indirectly as an agent, employee, officer, director ... partner or any other capacity whatsoever, in any business, venture, association or organization which engages in programming, designing, or marketing computerized information retrieval systems, system components anywhere in the United States of America, the United Kingdom, Canada, France, or any country in which Lexis–Nexis offers services or products to the public.

Lexis–Nexis Non–Compete/Non–Disclosure Agreement at 1.

▪ Beer argues that this agreement is vastly overbroad in that it prevents a lower-tier Lexis–Nexis employee like him from working in any capacity, anywhere in the world where Lexis–Nexis does business, for any company that programs, designs, or markets "computerized information retrieval systems, system components or products." The court agrees. First, by its plain terms, the agreement fails to sensibly identify the kind of competitive businesses that an employee like Beer must stay out of in order for Lexis–Nexis to protect its legitimate business interests. As witnesses for both parties agree, the term "computerized information retrieval systems" implicates potentially thousands of companies that Lexis–Nexis does not actually compete with. Second, given the inherently territorial nature of Beer's customer contacts, the almost worldwide application of the noncompete agreement makes its geographic scope unreasonably broad. Lexis–Nexis's own actions support these conclusions. On September 15,

1995, only four days after Beer signed the noncompete agreement at issue in this case, Lexis–Nexis revised its standard non-compete language. The revised agreement states that the term "competitive activity" should be interpreted to cover only businesses that "compete[ ] with Lexis–Nexis's business as conducted during the period of my employment with Lexis–Nexis." Lexis–Nexis Non–Compete/Non–Disclosure/Non–Solicitation Agreement at 1 (attached to Memo from Larry Fultz dated Sept. 15, 1995). Further, Lexis–Nexis revised the broad geographic definition contained in Beer's agreement by enumerating four different definitions of territories in which a Lexis–Nexis employee may not compete. The definition most readily applicable to a salesperson like Beer restricts the employee from working for a competitor within "a zone inside of a 100 mile radius of each of the counties or parishes in which my customer accounts are located or in which I performed services." *Id.* In light of these considerations, the court determines that Lexis–Nexis is highly unlikely to demonstrate that the noncompete agreement that Beer signed is reasonable.

▪ However, this does not end the court's inquiry. Under *Raimonde,* if the court determines that the noncompete agreement is unreasonable, it is "empowered to modify or amend [the agreement] to achieve [reasonable] results." 325 N.E.2d at 547. In fact, as Lexis–Nexis points out, language in *Raimonde* suggests that the court is required to modify the unreasonable agreement, rather than completely striking it: "[A] covenant to compete which imposes unreasonable restrictions upon an employee *will be enforced* to the extent necessary to protect the employer's legitimate interests." *Id.* at 547

---

**2.** The agreement also contains a nondisclosure provision, which Lexis–Nexis asserts Beer has also breached. This aspect of the agreement is unquestionably enforceable, at least to the extent it overlaps with the statutory and common law duties of a former employee to keep secret confidential information. The issue of how Beer's various duties regarding confidential information factor into the preliminary injunction equation is addressed in Part II.A.2 below.

(emphasis added). Here, the legitimate interest that Lexis–Nexis seeks to protect is the maintenance of the customer goodwill it has developed through Beer's work while he was an employee of the company. This goodwill is threatened if Beer works for a direct competitor of Lexis–Nexis in the sales territory where he previously cultivated customer relationships for Lexis–Nexis. Accordingly, the court concludes that a reasonable noncompete agreement would restrict Beer, for one year, from working in a sales position for a direct competitor like Dow Jones when that sales position involves contact with Lexis–Nexis's customers and prospective customers in the Minnesota territory.

Such a restriction is supported by each of the considerations outlined in *Raimonde*. It is narrowly tailored to the geographic area where Beer worked for Lexis–Nexis and to the customers Beer contacted in his capacity as a Lexis–Nexis sales representative. Its duration is long enough to ensure that Lexis–Nexis can maintain its hard-earned good will but not so long as to give Lexis–Nexis undeserved protection in the competitive market for electronic data services. It allows Beer to continue to exercise his inherent skill and experience without allowing him to exploit, at Lexis–Nexis's expense, the skills and relationships he developed while working for the company. Finally, it permits Beer to stay in his current job at Dow Jones, which is most likely his best means of earning a living. In short, the modified noncompete agreement contemplated above fairly balances the legitimate interests of both parties.

### 2. Trade Secret Claims

Lexis–Nexis also asks the court to enjoin Beer from working at Dow Jones on the grounds that it is likely to succeed on its trade secret claim against him. The Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn.Stat. §§ 325C.01–325C.08, protects certain types of information through an action for mis-

appropriation. MUTSA defines misappropriation as improper acquisition, disclosure, or use of a "trade secret." Minn. Stat. § 325C.01, subd. 3. The court analyzes three factors to determine whether a particular item constitutes a trade secret: (1) the information must not be generally known or readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the party asserting misappropriation must have made reasonable efforts to maintain the secrecy of the item. *See Nordale, Inc. v. Samsco, Inc.*, 830 F.Supp. 1263, 1273 (D.Minn.1993); *Electro–Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899–901 (Minn.1983). The party asserting misappropriation must establish each factor to sustain its claim. *See id.* Further, to obtain an injunction under MUTSA, the moving party must "show that there is 'a high degree of probability of inevitable disclosure.'" *IBM Corp. v. Seagate Technology, Inc.*, 941 F.Supp. 98, 100 (D.Minn. 1992) (quoting *Surgidev Corp. v. Eye Technology, Inc.*, 648 F.Supp. 661, 695 (D.Minn. 1986) *aff'd*, 828 F.2d 452 (8th Cir.1987)).

Applying these standards to the current record, the court is unable to conclude that the information possessed by Beer during and after his employment by Lexis–Nexis constitute trade secrets under MUTSA. Lexis–Nexis has submitted thousands of pages of documents, filling six boxes, that it alleges are trade secrets to which Beer has been exposed. The documents include detailed financial and usage reports, sales strategies and policies, and product development information. However, Beer has introduced evidence that much of the information contained in these documents is either readily ascertainable or will quickly become obsolete, thereby losing its independent economic value. *See Lasermaster Corp. v. Sentinel Imaging*, 931 F.Supp. 628, 637 (D.Minn. 1996) (rejecting MUTSA claim where "the information disclosed by [the employee] was readily accessible").

Further, the question of whether Lexis–Nexis has exercised reasonable efforts to maintain secrecy is hotly contested. Although Lexis–Nexis asserts that it maintained a formal policy regarding the confidentiality of these documents, Beer has produced evidence, through the deposition testimony of Lexis–Nexis employees, that these policies were frequently disregarded in practice. Indeed, as Beer points out, many of the documents that Lexis–Nexis has submitted as evidence of trade secrets are not labeled with the "Lexis–Nexis Confidential and Proprietary" mark required by company policy. Further, even after Lexis–Nexis brought this litigation, Lexis–Nexis continued to mail allegedly confidential documents to Beer. Given the contradictory nature of the evidence, the court cannot "make a specific finding whether the information [Lexis–Nexis] alleges is 'confidential' or 'trade secrets.'" *Seagate*, 941 F.Supp. at 100. And because "such findings cannot be made, ... injunctive relief is inappropriate." *Id.*

■ Finally, regardless of whether the information at issue constitutes a trade secret, Lexis–Nexis has failed to show that Beer would inevitably disclose the information to Dow Jones if he continued to work there. There is little evidence that Beer now possesses confidential Lexis–Nexis information, apart from what he might retain in his memory. And even on this point, the record clearly demonstrates that Beer, a sales manager, did not have the kind of intimate familiarity with corporate policies and strategies that might support a finding of inevitable disclosure under prior cases. *See, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (holding that high-level manager would inevitably disclose marketing and product development secrets of which he had intimate knowledge). Moreover, whatever limited information Beer might still retain will have lost considerable value now that (1) almost four months have passed since the TRO was issued against

him and (2) Beer has been transferred to Chicago.

## B. The Remaining *Dataphase* Factors

An inference of irreparable harm to Lexis–Nexis arises from Beer's earlier breach of the noncompete agreement as modified under the rule of reasonableness above. *See Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 125 N.W.2d 844, 845 (1964). For this reason, an order enjoining Beer from working in his old territory is appropriate. Because Beer has already decided to relocate to Dow Jones's Chicago office, this limited injunction will not cause Beer significant harm. It will, however, serve the public interest by ensuring that reasonable agreements are enforced to protect a business's hard-earned good will.

On the other hand, because Lexis–Nexis has not shown that Beer currently possesses trade secrets or that he will inevitably disclose confidential information, the court cannot infer that irreparable harm will occur unless he is enjoined completely from working for Dow Jones. If the court were to issue the sweeping injunction Lexis–Nexis requests, not only would Beer's livelihood become endangered on the basis of ambiguous misappropriation evidence, Lexis–Nexis would obtain, through the back door of trade secret law, the kind of unreasonable restriction it could not obtain via its original noncompete agreement. *See Seagate*, 941 F.Supp. at 101. ("A claim of trade secret misappropriation should not act as an ex post facto covenant not to compete."). Such a result is decidedly not in the public interest.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Lexis–Nexis's motion for sanctions is denied in part and continued in part. At an appropriate time later in the litigation, Lexis–Nexis may renew its motion for monetary sanctions.

2. Lexis–Nexis's motion for preliminary injunction is granted in part and denied in part.

3. David Beer is enjoined from soliciting or contacting any customers or prospective customers in the State of Minnesota while working in his capacity as a sales representative for Dow Jones Interactive Publishing. In the absence of another order, this injunction shall terminate on September 25, 1999. Beer shall also continue to conform to his contractual and legal duties not to disclose confidential information he gained during his employment with Lexis–Nexis.